Amy Wallace, Esq. (SBN 009851)
GILLESPIE, SHIELDS & DURRANT
7319 North Sixteenth Street, Suite 100
Phoenix, AZ 85020-5262
T:  602.870.9700
F:  602.870.9783
Email: awallace@gillaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| GEORGE REIDHEAD an individual, ESTATE OF BRENDA LEE TODD, a legal entity, LIANA TODD, SHAWN TODD, S.W, the natural child of Brenda Lee Todd, by and through her Next Friend, ANTHONY JACK WROBLEWSKI,<br><br>  Plaintiffs,<br><br>vs.<br><br>STATE OF ARIZONA; CHARLES L. RYAN, Director of Arizona Department of Corrections in his official capacity as Director of Arizona Department of Corrections; CO II JOHN COUGHLIN in his individual and official capacities, CO II TORY PAYNE in his individual and official capacities; CO II GEORGE REYES in his individual and official capacities; CO II CHERISE NELSON in her individual and official capacities, SERGEANT ARTHUR MALDONADO, SERGEANT JOSEPH SWIRSKY, NURSE DEBRA ELDER, JOHN DOE OFFICERS, I-X; JANE DOE OFFICERS, I-X; JOHN DOE SUPERVISORS, I-X; JANE DOE SUPERVISORS, I-X; JOHN DOES I-X; JANE DOES I-X; BLACK CORPORATIONS I-X; and WHITE PARTNERSHIPS, I-X,<br><br>  Defendants | **CASE NO.**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**[DEMAND FOR JURY TRIAL]** |

COMPLAINT – pg. 1

## COMPLAINT

For their Complaint against Defendants, Plaintiff GEORGE REIDHEAD ("GEORGE"), ESTATE OF BRENDA LEE TODD ("ESTATE"), LIANA TODD ("LIANA") SHAWN TODD ("SHAWN") AND S.W. ("S.W.") by and through her Next Friend ANTHONY JACK WROBLEWSKI ("ANTHONY JACK"), collectively ("PLAINTIFFS") allege as follows:

### I.
### JURISDICTION AND VENUE

1. This action arises under the Constitution of the United States, particularly the Fourth Amendment, Eighth Amendment and under the laws of the United States, particularly the Civil Rights Act, 42 U.S.C. § 1983, and under Arizona law.

2. This Court has jurisdiction over PLAINTIFFS' Federal Civil Rights claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 144.

3. This Court has supplemental jurisdiction over claims arising under the laws of the State of Arizona pursuant to 28 U.S.C. § 1376(c).

4. The acts complained of in this Complaint all occurred within Maricopa County, State of Arizona. All Defendants currently reside, or resided at relevant times, within Maricopa County, State of Arizona. Thus, venue is proper in the District of Arizona pursuant to U.S.C. § 1391(b).

5. As to the state claims under Arizona state law, a timely Notice of Claim was served on July 15, 2011 on the Governor and Attorney General of the State of Arizona, the Risk Management Department of the State of Arizona, Charles Ryan and the Arizona Department of Corrections, which complied in all ways with A.R.S § 2-821.01. The claim was deemed denied by operation of statute.

### II.
### PARTIES

6. GEORGE is a citizen of the United States of America and a resident of Apache County and was so at all times relevant to this Complaint. He is the father of

COMPLAINT – pg. 2

decedent BRENDA LEE TODD ("BRENDA"), who was an inmate of Arizona State Prison Complex-Perryville ("ASPC-Perryville") at the time of her death. GEORGE brings this matter on behalf of himself, an individual, as the father of BRENDA.

7. ESTATE is a legal entity formed in Maricopa County, Arizona.

8. LIANA is a citizen of the United States of America and is a resident of Marion County, Indiana and was so at all times relevant to this Complaint. LIANA brings this matter on behalf of herself, an individual as the daughter of BRENDA.

9. SHAWN is a citizen of the United States of America and is a resident of Marion County, Indiana and was so at all times relevant to this Complaint. SHAWN brings this matter on behalf of himself, an individual as the son of BRENDA.

10. S.W. is a citizen of the United States of America and is a resident of Maricopa County, Arizona and was so at all times relevant to this Complaint. ANTHONY JACK as Next Friend brings this matter on behalf of S.W., an individual as the natural daughter of BRENDA.

11. Defendant STATE OF ARIZONA ("STATE") is a body politic.

Defendant CHARLES RYAN ("RYAN") is the Director of the Arizona Department of Corrections ("ADC").

12. Defendant CO II JOHN COUGHLIN (" CO COUGHLIN") was assigned Arizona State Prison Complex ("ASPC") Perryville, Santa Maria Unit, on January 20-21, 2011. COUGHLIN is an employee of STATE.

13. Defendant CO II TORY PAYNE ("CO PAYNE") was assigned to ASPC-Perryville, Santa Maria Unit, on January 20-21, 2011. CO PAYNE is an employee of STATE.

14. Defendant CO II GEORGE REYES ("CO REYES") was assigned to ASPC-Perryville, Santa Maria Unit, on January 20-21, 2011. CO REYES is an employee of STATE.

15. Defendant CO II CHERISE NELSON ("CO NELSON") was assigned to ASPC- Perryville, Santa Maria Unit, on January 20-21, 2011. CO NELSON is an employee of STATE.

COMPLAINT – pg. 3

16. SERGEANT ARTHUR MALDONADO ("SGT. MALDONADO") was a supervisor in charge of ASPC-Perryville, Santa Maria Unit on January 21, 2011. SGT. MALDONADO is an employee of STATE.

17. SGT. MALDONADO approved the day starting with ten COs, but then cross-leveled four COs out of the unit, leaving only one female CO, CO II NELSON who was also required to conduct strip searches. This left CO NELSON'S post at Santa Maria abandoned while she conducted strip searches, which SGT. MALDONADO called, "a constant battle".

18. SERGEANT JOSEPH SWIRSKY ("SGT. SWIRSKY") was a supervisor in charge of ASPC-Perryville, Santa Maria Unit on January 21, 2011. SGT. SWIRSKY is an employee of STATE.

19. SGT. SWIRSKY conducted a security inspection of the unit at 7:26 a.m. SGT. SWIRSKY told investigators that when the CO NELSON, the sole female CO on duty that morning on the unit, was out conducting strip searches, the kitchen officer is directed to assist on the unit by conducting security checks. SGT. SWIRSKY admitted that CO NELSON should have been replaced on the unit on January 21, 2011 by a kitchen officer but that did not happen that day.

20. Defendant NURSE DEBRA ELDER ("NURSE ELDER") was assigned to ASPC- Perryville, Santa Maria Unit, on January 20-21, 2011. NURSE ELDER is an employee of STATE.

## III.
## FACTS COMMON TO ALL COUNTS

21. At all times alleged in this Complaint, BRENDA was an inmate of ASPC-Perryville, in Goodyear, AZ, housed in Santa Maria Unit.

22. January 14, 2011, BRENDA was seen at the infirmary for shoulder, neck and back pain with a scheduled follow up visit for January 21, 2011.

COMPLAINT – pg. 4

23. On January 20, 2011 and into the evening hours, BRENDA was having chest pain, left arm pain, numbness and tingling and pain in her neck as well as throat constrictions and difficulty breathing.

24. Each of the symptoms BRENDA was having on January 20, 2011 was a symptom of cardiac arrest, commonly known as a heart attack. These symptoms are well known to lay persons not employed in the medical field and are certainly well known to medical professionals as symptoms of cardiac arrest.

25. Several other inmates who saw BRENDA on January 20, 2011 reported that she appeared to have trouble breathing that entire day. Essentially, BRENDA was in medical distress for the entire day and evening of January 20, 2011.

26. BRENDA was worried about her symptoms and went to pill call in the evening of January 20, 2011 to inform the nurse on duty of her symptoms.

27. While in the pill call line, inmate Melissa Gomez was in line directly behind BRENDA. Melissa Gomez reported to ADC investigators that she heard BRENDA "begging" the nurse in pill call, NURSE ELDER, for help. BRENDA told NURSE ELDER at that time that she had numbness and trouble breathing. <u>These are classic symptoms of cardiac arrest that require immediate medical attention.</u>

28. Instead of getting BRENDA the necessary medical attention she required, NURSE ELDER replied, "There is nothing I can do for you. Put in an HNR and go lay down." When BRENDA said she had put in multiple HNRs, NURSE ELDER said "We have no staff here, except at complex. There is nothing I can do".

29. NURSE ELDER then told BRENDA to take some Ibuprofen, to lie down and drink some water. BRENDA did as instructed and took the medication and went to lie down. BRENDA spent the rest of the evening doing artwork in the resource center before going to bed.

30. While in the resource center, BRENDA told several inmates that she had severe neck and chest pain and had put in numerous HNRS before that time.

31. At around 8:30-8:40 p.m. on January 20, 2011, inmate Amber Browning heard someone banging. She knew what time the banging occurred because it was during this time she was watching the show "Grey's Anatomy" on television when she heard the disturbance.

32. Amber Browning and her cellmate yelled, "Who is banging?" but only heard someone reply to the effect that it wasn't them.

33. Amber Browning reported that the banging stopped and started up again, but stopped again.

34. Immediately after the banging, several other inmates reported hearing a Corrections Officer say, 'Go lay down, sleep it off.'

35. Inmate Reyna Luna reported to ADC investigators that BRENDA looked like she was having discomfort in her breathing on January 20, 2011.

36. Inmate April Gomez saw BRENDA in her Thursday morning (January 20, 2011) DUI class. During the class BRENDA said she didn't feel well and put her head down on the table during the January 20th morning class.

37. CO COUGHLIN worked the shift that included Santa Maria Unit on January 20, 2011 from 1700 hours to 2155 hours, or 5 p.m. to 9:55 p.m. during the time the other inmates at Santa Maria reported hearing banging.

38. An inmate who lived below BRENDA in fact *specifically told* CO COUGHLIN that she heard some kind of noise, but didn't know what it was.

39. CO COUGHLIN told ADC investigators that he didn't hear any banging and didn't hear anyone making any kind of noise despite the inmates having heard these noises and *despite the fact that the inmates reported these noises directly to him*.

40. CO COUGHLIN never investigated the source of these noises at any time on his shift.

41. CO PAYNE started his shift at Santa Maria Unit on the evening of January 20, 2011 with two other cross level officers on the shift, but the two other officers left around

COMPLAINT – pg. 6

2230 hours or 10:30 p.m., leaving him to work the rest of his shift alone until 5:20 a.m. on January 21, 2011.

42. CO PAYNE reported seeing BRENDA sleeping at 2300 hours, or 11:00 p.m.

43. CO PAYNE reported to the ADC investigators that he was performing hourly security checks and informal counts. CO PAYNE stated the reason he was doing an informal count every hour was because "…he was told one of the inmates on the yard was having breathing problems, but he wasn't told which one."

44. ASPC-Perryville/Santa Maria Housing Unit Post Order PO-054-B04, effective September 30, 2010, Addendum E in pertinent part provides as follows: Section 1.7.3 directs graveyard shift officers to conduct security checks at *30 minute intervals*.

45. ASPC-Perryville/Santa Maria Housing Unit Post Order PO-054-B04, effective September 30, 2010, Addendum F in pertinent part provides as follows: Section 00.01.17.2.1 states, "If a staff member cannot complete a security check within the allotted time period they must notify their supervisor before the time period expires."

46. CO PAYNE was on graveyard shift from January 20-January 21, 2011 but did NOT perform security checks at 30-minute intervals and did NOT notify his supervisor, in violation of Post Order PO-0540B04 and despite knowing that one of the inmates was having breathing problems.

47. CO PAYNE did NOT record a journal entry for a security check at 0230 hours or 0500 hours on January 21, 2011.

48. The ADC interviewed CO PAYNE on February 8, 2011 and again on March 4, 2011.

49. During the February 8th interview, CO PAYNE reported seeing BRENDA sleeping during the formal count at 2300 hours.

50. During the March 4th interview, CO PAYNE stated BRENDA "…was awake" when he conducted his security checks.

51. CO PAYNE first reported to the ADC that the last time he saw BRENDA was at 4:00 a.m. at his last count.

COMPLAINT – pg. 7

52. Contradicting his first statement to the ADC, in his second interview CO PAYNE reported to the ADC that he saw BRENDA during his 5:20 a.m. hour check and that everything appeared to be normal with her at the 5:20 a.m. check and that there was "…no doubt" that BRENDA was alive at 5:20 a.m. during his last check before he was relieved by day shift.  The ADC noted the inconsistency in CO PAYNE'S statements regarding the time he last saw BRENDA before his shift ended.

53. CO NELSON began her security checks at 6:30 a.m.  At that time, she saw BRENDA laying on her back with her head turned toward the wall on her bunk with her legs draped over the bunk's edge.  CO NELSON reported that she "attempted" contact with BRENDA but that BRENDA was sleeping.  CO NELSON continued on with her checks.

54. At 8:20 a.m. on January 21, 2011, CO NELSON checked again on BRENDA and noticed that she was in the exact same position that she had been in as at 6:30 a.m.

55. Seeing this, CO NELSON then went in to attempt to arouse BRENDA to awaken, but was unable to, and initiated an Incident Command System ("ICS") when BRENDA didn't move at all.

56. A search of the cell was conducted after BRENDA'S body was discovered.  At that time, investigators found a brown paper towel with a black pen resting on the top.  The writing in the cell on the brown paper towel referenced pain experienced due to pinching in the shoulder.  Other writings located referenced pain and headaches.

57. During the entire time period from the morning of January 20, 2011 to the early hour of January 21, 2011, BRENDA was repeatedly ignored in her pleas for help.

58. She was experiencing pain and difficulty breathing to the point that she begged NURSE ELDER for help during pill call on the evening of January 20, 2011, only to be told to "go lie down and take some Ibuprofen".  This despite the fact that BRENDA was describing symptoms of cardiac arrest.

59. CO COUGHLIN failed to investigate the source of the noises, BRENDA'S frenzied pounding on her door for help, despite the fact that CO COUGHLIN had been told by several inmates that they heard these noises.

COMPLAINT – pg. 8

60. CO PAYNE failed to do security checks every 30 minutes as required by Post Orders, failed to specifically find out which inmate had breathing problems, failed to check in on any of the inmates regarding any breathing problems. CO PAYNE then reported different times for when he last checked in on BRENDA during his shift from January 20-21, 2011. He also reported alternatively that he last saw BRENDA sleeping and then last saw her awake.

61. CO NELSON failed to make contact with BRENDA at 6:30 a.m. and didn't check in again on her until 8:20 a.m. at which time she noticed that BRENDA had not moved her position.

62. SGT. SWIRSKY had no communication with CO NELSON prior to conducting his own security check at 7:26 a.m. For a total of three security checks from 6:30 a.m. to 8:20 a.m., neither SGT. SWIRSKY nor CO NELSON confirmed that BRENDA was lying immobile in an identical position until it was too late.

63. For a second time in 24 hours, there was a known failure to do a check at required 30 minute intervals, despite the report of an inmate having a breathing problem.

64. BRENDA'S pleas for help were ignored in deliberate indifference of her health, safety and life.

65. Her direct, explicit pleas for medical help for symptoms of cardiac arrest were expressly rejected by NURSE ELDER on the evening of January 20, 2011, who told her simply to take over-the-counter medication and lie down.

66. Her pleas for help were again ignored by CO COUGHLIN when she banged on her door for help, creating a noise loud enough to be heard by inmates on the second floor but for which CO COUGHLIN offered no help.

67. CO PAYNE admitted to failing to conducting 30 minute interval checks despite being advised that an inmate on his shift had breathing problems, and failing to ascertain which inmate was having breathing problems.

68. CO NELSON also admitted to failing to conduct a 30 minute interval check on her shift even *after* she was unable to arouse BRENDA from sleep.

69.     SGT. SWIRSKY admitted that another CO should have replaced CO NELSON while she did strip searches on the unit, resulting in understaffing, causing him to conduct a security check late.  The late security check was done in violation of Post Orders, and without proper communication, the end result being that no one noticed BRENDA hadn't moved from the exact position she had been in for an hour.

70.     As a result of these numerous failures, BRENDA died alone in her cell, definitely in pain and most certainly in fear.  Her death was entirely preventable.

## IV.
## CLAIMS FOR RELIEF
### Count One
### 42 U.S.C § 1983: Deliberate Indifference to Medical Needs; Failure to Observe and Monitor Medical Conditions
### [Against all Defendants except STATE]

71.     PLAINTIFFS hereby re-allege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of the complaint.

72.     This Count is brought under 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution.

73.     Each of the Defendants except STATE demonstrated deliberate indifference to BRENDA'S medical needs, failed to properly dispense appropriate medical care, failed to timely and appropriately observe and monitor her after being placed on notice that she had numerous symptoms of cardiac arrest, including difficulty breathing, failed to respond to her banging on her door crying out for help and failed to even notice her immobile body on her bed.

74.     Their numerous instances of deliberate indifference to her medical needs at all times alleged herein caused or contributed to her death.

75.     The wrongful conduct of all Defendants except STATE as described herein constitutes deliberate indifference to BRENDA'S basic medical needs and thus violated her rights under the Eighth Amendment to the United States Constitution in that she was deprived of the rights, privileges and immunities guaranteed to all citizens of the United

States; was deprived of her life and liberty without due process of law; was denied equal protection of the law; denied proper medical treatment and was subjected to unlawful and improper punishment.

76. The wrongful conduct of all Defendants except STATE constitutes violations of United States Constitution, Amendment VIII, in that all PLAINTIFFS herein have been deprived of their constitutional familial relationship, companionship and society of their daughter and mother, BRENDA.

77. The actions of all Defendants except STATE, and each of them, in their individual capacities, were malicious or reckless in disregard of the rights of BRENDA and PLAINTIFFS thereby justifying the awarding of exemplary and punitive damages against each Defendant in an amount to be determined by a jury to punish each of them for their wrongdoing and to deter and prevent them and others from acting in a similar manner in the future.

## Count Two

### Supervisory Responsibility—42 U.S.C § 1983

### [Against Defendant RYAN]

78. PLAINTIFFS hereby re-allege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of the complaint.

79. This action is brought pursuant to 42 U.S.C.§ 1983 and the Eighth Amendment to the United States Constitution.

80. On or before the date of the incident alleged herein, RYAN had knowledge of other numerous cases of egregious deliberate indifference to the medical needs of inmates in the ASPC carried out by ADC employees since his tenure began at ADC, but failed to take appropriate steps to address the medical needs of inmates and failed to appropriately address these failures with ADC employees.

81. From mid 2009 to the present, 28 suicides occurred in ASPC facilities despite a drop in the prison population during those years. In the two and half years before RYAN took over, there were 12 suicides during a similar time period.

82. The medical needs of suicidal inmates within the ADC were well documented before RYAN assumed the role of Director of the ADC. The medical needs of these

COMPLAINT – pg. 11

inmates were routinely ignored by refusing to provide psychiatric help to inmates and by failing to have adequate medical personnel on staff to treat these inmates

83. In the summer of 2009, ASPC Perryville Inmate Marcia Powell, who had psychiatric illness, was kept in a cage outside in the direct Arizona summer sun while she suffered third degree burns and dehydration. She died in her feces, from her burns while she begged for water. Her death was a result of the deliberate indifference of the ASPC-Perryville staff to her immediate medical needs.

84. Inmate Huberta Parlee died of a perforated ulcer while begging for treatment as a result of pain from the ulcer; <u>her cries for treatment were ignored for a period of two days before she died.</u>

85. Another ADC inmate with a growth on his penis was denied medical treatment for two years. Doctors had to amputate his penis after the cancer spread to his stomach.

86. A diabetic ADC inmate <u>waited for insulin for months</u>, causing blindness in one eye.

87. An ADC inmate with a cancerous growth on his lip waited <u>seven months for treatment</u>. Most of his lip and mouth had to be removed, causing permanent disfigurement.

88. ADC Inmate Horace Sublett was denied treatment for Kaposi's sarcoma, a type of cancer.

89. In a letter dated October 12, 2011 to Charles Ryan from Donald Specter, executive director of San Quentin, California-based Prison Law Office described numerous instances of deliberate indifference by ADC personnel to the health care needs of ADC inmates, causing pain, suffering and even deaths.

90. On November 17, 2011, the ADC agreed to allow an investigation into the claims of deliberate indifference to medical needs of ADC inmates, in exchange for the agreement by the Prison Law Office to delay a lawsuit against the ADC in exchange for the agreement.

91. The Prison Law Office confirmed that ASPC-Eyman in Florence had only one half time psychiatrist for more than 1,000 patients who were on medications. That position is now vacant.

COMPLAINT – pg. 12

92. In April 2011, ASPC-Eyman and ASPC-Tucson, with more than 5,000 prisoners each, are required to have five (5) doctors on staff. At that time, Eyman had two doctors and a third working half time. Tucson only had two doctors. The shortage of doctors is system-wide at all ASPC locations, including ASPC-Perryville.

93. At ASPC-Perryville, inmates had to wait six months to see the mental health staff.

94. At the time of BRENDA'S death, RYAN had in place, and had ratified, official polices, procedures, longstanding customs and practices which permitted and tacitly encouraged their ADC Corrections Officers to ignore the medical needs of its prisoners for lengths of time, causing bodily injury and death.

95. Furthermore, RYAN has been informed and is aware of extensive documentation of numerous acts of deliberate indifference conducted by ADC custody deputies toward inmates at ASPC facilities. RYAN was also aware of numerous written recommendations made to attempt to correct these violations of law carried out.

96. Said longstanding customs and official policies also called for RYAN not to discipline, prosecute or objectively investigate or in any way deal with or respond to known incidents and/or complaints of deliberate indifference, or the related claims and lawsuits made as a result of such abuse.

97. Said official policies, procedures, longstanding customs and practices of RYAN evidenced a deliberate indifference to the violations of BRENDA'S constitutional rights. This indifference was manifested by the failure to change, correct, revoke or rescind said policies, procedures, customs and practices in light of the damage and death to inmates including BRENDA.

98. Deliberate indifference is also evidenced by maintenance of an inadequate system of training with respect to the deliberate indifference alleged herein, which failed to identify instances of improper similar conduct, as well as the failure of RYAN to adequately train and closely supervise, discipline or retrain Corrections Officers who improperly engaged in such conduct.

99. The foregoing acts and systemic deficiencies are policies and customs of RYAN which caused Defendants herein to be unaware of the rules and laws governing

permissible medical supervision of inmates in their custody and also to believe that such contact was and is entirely within the discretion of the officer and further that improper abuse of authority would not be objectively, thoroughly and properly investigated, all with the foreseeable result that BRENDA'S civil rights would be violated.

100.   The aforementioned acts, omissions, systemic deficiencies, policies, procedures, customs and practices of RYAN resulted in BRENDA to be unreasonably and unjustly deprived of PLAINTIFF'S civil rights.

## Count Three
## Negligence and/or Gross Negligence
## [Against Defendant STATE only]

101.   PLAINTIFFS hereby re-allege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of the complaint.

102.   At all times alleged in the Complaint, STATE had a non-delegable duty for the care, custody and control and safety of inmates within the STATE'S prison system. The duty of care includes, but is not limited to, the duty to assess the medical needs of inmates, to provide necessary medical care to inmates and to properly and timely respond to requests for medical care.

103.   Defendant STATE breached that duty by ignoring BRENDA'S need for medical care for the entire 24-hour period before her death; failing to respond to her *specific pleas* for medical care, which included begging for help at evening pill call on January 20, 2011, ignoring her pleas and cries for help when she was banging on her door during the evening of January 20, 2011, failing to check in on her every 30 minutes, as required by ASPC-Perryville, despite the knowledge that an inmate had breathing problems, leaving her to die alone in her cell.

104.   As a direct and proximate result of the negligence and/or gross negligence alleged herein, BRENDA died of cardiac arrest, alone in her cell at age 44.

105.   As a further result of Defendant STATE'S negligence and/or gross negligence as set forth in this Complaint, PLAINTIFFS have suffered harms and losses including but not limited to: (1) the loss of love, affection, companionship, care, protection and guidance

since BRENDA'S death and in the future; (2) the pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced, currently experienced and to be experienced in the future; (3) medical, funeral and death expenses; (4) loss of income, future earning capacity and services that have already been lost as a result of BRENDA'S death and will continue to be lost in the future.

## Count Four

### Article 2, Sections 2 and 15 of the Arizona Constitution

### [Against Defendant STATE only]

106. PLAINTIFFS hereby re-allege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of the Complaint

107. Article 2, section 2 of the Arizona Constitution guarantees persons due process of law, and Article 2, section 15 of the Arizona Constitution forbids cruel and unusual punishment. For the reasons set forth above, Defendant STATE'S conduct violated these constitutional provisions.

108. As a further result of Defendant STATE'S breaches of the Arizona Constitution, PLAINTIFFS suffered harms and losses including but not limited to: (1) the loss of love, affection, companionship, care, protection and guidance since BRENDA'S death and in the future; (2) the pain, grief, sorrow, anguish, stress, shock and mental suffering already experienced, currently experiencing and to be experienced in the future; (3) medical expenses, funeral and death expenses and (4) loss of income, future earning capacity and services that have already been lost as a result of BRENDA'S death and will continue to be lost in the future.

## Count Five

### Wrongful Death, A.R.S. §12-611, *et. seq*.

### [Against Defendant STATE only]

109. PLAINTIFFS hereby re-allege and incorporate by reference, as though fully set forth herein, all preceding paragraphs of the Complaint.

110. As more fully described above, all Defendant STATE is either directly or vicariously responsible for the death of BRENDA.

COMPLAINT – pg. 15

111. Pursuant to A.R.S. § 12-611, *et. seq,* liability for wrongful death exists if a person's death is caused by "wrongful act, neglect or default."

112. In the instant matter, Defendant STATE'S "wrongful act, neglect or default" encompasses numerous acts of negligence, gross negligence, violations of the United States Constitution, violations of the Arizona Constitution and acts of deliberate indifference toward the health, safety and life of BRENDA, which resulted in her death.

113. All PLAINTIFFS are entitled to maintain an action for wrongful death and to be compensated for all losses and injuries suffered as a result of the death of BRENDA, which occurred as a result of the numerous State and Federal Constitutional violations, negligence and/or gross negligence of Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS for each and every Count above demand the following relief, jointly and severally, against all Defendants.

    a) Compensatory, general and special damages in a sum in an amount according to proof;

    b) Exemplary damages for the intentional acts described above and/or for those done recklessly or with deliberate indifference, in an amount sufficient to deter and to make an example of those Defendants.

    c) All costs of suit necessarily incurred herein as allowed by 42 U.S.C. § 1988;

    d) Prejudgment interest according to proof;

    e) Attorneys' fees as allowed by 42 U.S.C. § 1988 and

    f) Such further relief as the Court deems just or proper.

**DEMAND FOR JURY TRIAL**

PLAINTIFFS demand a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

DATE: January 13th, 2012				GILLESPIE, SHIELDS & DURRANT

/s/ Amy J. Wallace
------------------------------------------------
AMY J. WALLACE, ESQ.
Attorneys for Plaintiffs

COMPLAINT – pg. 17